## Elkins, Bly & Co. *versus* McKean.

1. In a suit against a refiner and vendor of petroleum for the death of plaintiff's husband, alleged to have been caused by the explosion of the oil, the allegation and evidence of plaintiff were that the oil exploded in a lamp in his hand whilst he was walking quietly; the defendant's allegation and evidence were that the death was caused by his tripping and falling with the lamp in his hand. In charging, the court said, " Was the death occasioned by the explosion at the time and in the manner claimed by the plaintiff? In regard to this there can be no doubt whatever." *Held* to be error; whether

[Elkins, Bly & Co. *v.* McKean.]

the death was caused by the explosion as alleged by the plaintiff was for the jury.

2. The declaration averred that the defendants wilfullly sold the oil for lighting purposes, "knowing that it was highly inflammable, explosive and unsafe," &c. There was evidence that the oil had been sold by defendants, but none that the sale was with wilful knowledge of its dangerous character: *Held* to be error to submit the case to the jury.

3. Statements as to the cause of the accident made by the deceased at and about the time of its occurrence, whilst he was covered with fire, were competent evidence as part of *res gestæ*.

4. The fact that the oil had passed through a number of intervening vendors before it was procured by the deceased, would not prevent a recovery against the defendants, if their guilty knowledge and the identity of the oil were established.

5. The responsibility of the manufacturers would attach from their putting the oil on the market and holding out that it might be safely used as illuminating oil.

November — 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas, No. 2, of *Allegheny county:* Of October and November Term 1875, No. 65.

This was an action on the case to April Term 1873 of the court below, brought by Elizabeth McKean against George W. Elkins and others, trading as Elkins, Bly & Co.

There were three counts in the declaration:—

1. That defendants were manufacturers and vendors of carbon oil for illuminating purposes; that James A. McKean, the husband of plaintiff, purchased a quantity of oil to be used in a lamp; that defendants, knowingly, wilfully and of their mere negligence, manufactured and sold, for illuminating purposes, oil that was highly inflammable, explosive, unsafe and dangerous, knowing it to be such; that James A. McKean purchased the same, and whilst using it in a lamp in a proper and prudent manner, the oil exploded and caught fire, the burning oil was scattered over McKean and so burned him that he died.

2. That the defendants being such manufacturers and vendors of oil, did knowingly, fraudulently and maliciously put upon the market, &c., certain carbon oil, representing it to be of a safe and reliable quality of the fire test of 110°, well knowing that the oil so sold by them for illuminating purposes was in fact highly inflammable, explosive and dangerous; that McKean, relying upon these representations, purchased from vendees of the defendants a quantity of the oil, and whilst using it in a lamp, the oil took fire and exploded the lamp, he was burned and died from the burns

3. That the defendants being manufacturers of such carbon oil, put upon the market oil, and sold a certain carbon oil marked as 110° fire test; that it was the duty of the defendants, their agents and servants, to take reasonable and proper care that the oil should be safe and not inflammable or explosive, or give notice that it

was thus dangerous, yet they knowingly, carelessly, and negligently sold the oil, knowing it to be unsafe and dangerous ; that McKean, in the course of trade, purchased the oil from those to whom the defendants sold it, not knowing that it was dangerous, and in using it he was burned, and died.

The plea was, "Not Guilty."

The case was tried December 1st 1874, before Kirkpatrick, J.

The plaintiff testified that her husband, on Tuesday the 11th of February 1873, went into his cellar to turn off the water, having a lighted lamp in his hand ; it was an opaque white glass lamp with a blue rim ; after he had been in the cellar about ten minutes, witness heard cries for help and went to the cellar ; she saw him on fire, his clothes burned ; he was in the cellar about midway between where the water was to be turned off and the stairs ; the lamp was still burning ; he died the next day. The oil had been purchased by McKean on the preceding Saturday.

It was proposed to ask the witness what her husband said as to the cause of the accident at or within a few moments of the time when she found him covered with flames in the cellar and apparently dying, as a part of the *res gestæ* and with a view to show that the burning and death were caused by the explosion of the oil in the lamp carried by the deceased, and to establish its defective and dangerous character.

Defendants objected to the offer as irrelevant and incompetent for the purpose set forth in the offer. The evidence was admitted and a bill of exceptions sealed for the defendants.

Witness proceeded : " I asked him how it happened ; I asked him if he had tripped on anythimg. This was in the cellar, when I went down. He said he had not ; that he was walking along the cellar calmly and peaceably and he heard a noise, and before he could realize what it was, the whole top flew off the lamp and the oil came down all over him.

The coroner of Allegheny county testified that he was present at a test made of illuminating oil, which he procured for the purpose after the accident occurred, at the store of Steele & Hart ; it was furnished by Mr. Steele himself from a tin can ; it was put into a " pop-bottle ; " there was a boy in the store at the time. He testified also that the lamp was, at the coroner's inquest, proved to be that which McKean had, and in which the oil exploded ; that it was a white lamp with a blue streak around it.

The fire marshal of Pittsburg accompanied the coroner to procure the oil for the test ; he testified as the coroner had done.

Robert Fedder, the boy spoken of by the coroner as being in Steele & Hart's store, testified that in February 1873, McKean bought oil at that store ; the witness sold it to him ; he filled a lamp, such as is described above, and such an one as he also saw at the coroner's inquest ; he got it from a can in the store, used for hold-

[Elkins, Bly & Co. *v.* McKean.]

ing oil; Steele & Hart had bought the store from Caskey, and the oil that was in the can was bought from them with the rest of the store; when the coroner and the fire marshal got the oil for a sample from Mr. Steele, it was taken from the can, which was the only can they had in the store; there had been no oil put into the can from the time he had filled McKean's lamp, up to the time the oil had been given to the coroner; it was the same oil that was in the can when Steele & Hart took the store; there was one oil barrel in the store, but it had no oil in it; the barrel came from Caskey's; the brand "Elkins, Bly & Co.," and "110° fire test," was on the barrel; the oil that was in that barrel was put into the can, and no other oil had been put into the can for about two or three weeks before he filled the lamp. Steele & Hart had no oil in the store but that which they bought from Caskey; they bought Caskey out about the 16th of January.

Samuel Steele, of the firm of Steele & Hart, testified: that the firm purchased W. J. Caskey's store on the 16th of January 1873, and amongst other things about thirty gallons of oil in a large tin can; they had purchased from Caskey no oil in barrels; none except that in the can; shortly after McKean's death, witness gave to the coroner oil out of the tin can; there was but one tin can; he gave him a "pop-bottle" full; witness had purchased a barrel of oil from Arbuckle & Co., on Monday the 10th of February, the day before McKean was burned; the oil he gave to the coroner was from this barrel, and not from that which he had got from Caskey; that which was got from Arbuckle & Co. was put into the tin can; witness knew nothing of the oil the firm got from Caskey, except that it was in the tin can; the can was empty when Arbuckle's oil was put into it; witness put the oil they got from Arbuckle & Co. into the empty barrel, and returned to Elkins, Bly & Co.; the oil given to the coroner was Elkins, Bly & Co.'s Riverside oil; witness did not know anything of the oil that had been in the can previously to that which he put in from the barrel bought from Arbuckle & Co. Neither this witness nor his partner, Hart, who was examined, could tell the brand on the oil barrel which they got from Caskey; that barrel was empty when they got it.

J. M. Torrence, salesman for Arbuckle & Co., testified: On or about January 11th 1873, that firm sold oil to Caskey; it was the Riverside brand, manufactured by Elkins, Bly & Co.; the brand on the barrel was "Elkins, Bly & Co.;" the name of the oil would be carbon oil; it was called Riverside oil; that was the name of the refinery. The fire test at that time for Pennsylvania was 110°, and it was marked on the barrels; no oil was sold to Caskey after January. Steele & Hart bought a barrel February 10th. Witness took the inventory of Caskey's goods at the time of his sale to Steele & Hart; he then saw a barrel there in the cellar, but did

[Elkins, Bly & Co. v. McKean.]

not examine if there was oil in it; he saw the tin can from which they retailed upstairs; the oil purchased by Arbuckle & Co. and sold to Caskey and Steele & Hart, was purchased from Elkins, Bly & Co.; Arbuckle & Co. never drew the bungs; they sold the oil as they received it in perfect confidence, relying on the manufacturers. All the recollection of the witness was from the entry in the book, and he inferred that it was the Riverside brand, because they kept no other. "They may have bought that barrel of oil from somebody else, but our books show a sale of a barrel of oil. I don't claim to have any personal knowledge of the sales at all." Witness did not know that the Arbuckles bought from Elkins, Bly & Co., except by the books; Arbuckles bought directly from the manufacturers. Oil the Arbuckles would sell in January, and that they would sell in February would not come from the same lot. The way they purchased oil from Elkins, Bly & Co., was to buy a lot and take it away as they needed it; all their oil was bought from Elkins, Bly & Co.

W. J. Caskey testified: that in January 1873, he sold his store to Steele & Hart; amongst other things about one-third of a barrel of oil in a tin can; the oil was purchased from Arbuckle & Co.; he did not recollect the brand of the oil; on the day after the death of McKean he was at Steele & Hart's store, and saw some oil taken out of the can; the oil was tested in the way they usually tested it, by drawing a match on it; it ignited; he had often done that before and it put the match out; witness could not tell whether that was the same oil he had sold to Steele & Hart; witness had been getting oil from different places; the last few barrels he had got from Arbuckles; he bought most of his oil from Arbuckles; he had frequently tested the oil he got from Arbuckles by a match, and it put it out; what he got from Arbuckles always stood the test.

Plaintiff proposed to show by J. R. Neald, United States Inspector of Steamboats, the tests applied (and their results) to the oil obtained from Coroner West and Fire Marshal Butler, which they obtained from Steele & Hart, alleged to be part of the same sold by them to deceased, and manufactured and sold by Elkins, Bly & Co., defendants, to the said Steele & Hart, and this to prove that the oil manufactured and sold by them, by which deceased came to his death, was defective and dangerous.

The defendants objected to the offer.

Because the plaintiff has proved in chief that the oil subjected to test was not the same oil which was in the lamp alleged by her to have exploded and caused the injuries complained of.

The objection was overruled and a bill of exceptions sealed for defendants.

The plaintiff gave other testimony in support of her case, not bearing on the question whether the oil in McKean's lamp had

29 P. F. Smith—32

[Elkins, Bly & Co. v. McKean.]

been manufactured and sold by defendants as safe illuminating oil.

For defendants, Emma Bear testified, that at the time McKean was burned, his wife came up out of the cellar, saying her husband had tripped over a piece of wood and fallen.

The defendants gave evidence also for the purpose of showing that the oil by which McKean was injured was not oil sold by defendants as safe illuminating oil, and that the oil tested for the coroner's inquest was not the oil from which McKean had procured that used in his lamp.

The court charged:—

\* \* \* ["The first question will be, Was the death of James B. McKean occasioned by the explosion at the time and in the manner claimed by plaintiff? In regard to this there can be no doubt whatever.]

"The next question will be, Was the identical oil which caused his death manufactured and sold by defendants as claimed by plaintiff? If it was not, there can be no recovery and your verdict must be for the defendants; the burden of showing to your satisfaction that it was the identical oil, rests upon the plaintiff; she having alleged it, the burden of proof is upon her. If you should get beyond this question, the next one which presents itself, and possibly the most important question in the case is, Did the defendants wilfully and maliciously put it upon the market, knowing it, as she alleges in her declaration, to be unsafe, explosive, dangerous, and unfit for illuminating purposes; because if they did not, under these allegations contained in this declaration or statement of her cause of action, there can be no recovery, and your verdict must be for the defendants. Here again, too, we must remind you the burden of proof is upon the plaintiff, and the necessity of satisfying you in this important particular is a labor which the law wisely imposes upon her, and from which she cannot escape. If she has not so satisfied you, as I have already intimated, there can be no recovery, and your verdict must be for the defendants."\* \* \*

The following are points of defendants; they were all refused:

2. "If the jury find that the oil in controversy was sold in large quantity to Arbuckle & Co. by the defendants, Elkins, Bly & Co., by Arbuckle & Co. to W. J. Caskey, by W. J. Caskey to Steele & Hart, and by Steele & Hart to the deceased, the plaintiff cannot recover in this action."

3. "There is no evidence in this case which would justify the jury in finding that defendants knowingly and wilfully sold the oil, and that it was highly inflammable, unsafe and dangerous."

6. "Under the pleadings and evidence, the plaintiffs are not entitled to recover."

The verdict was for the plaintiff for $3500.

[Elkins, Bly & Co. v. McKean.]

The defendants took a writ of error ; they assigned for error:

1. Admitting evidence of the declarations of the deceased.

2. Admitting evidence of the tests applied by the coroner's inquest.

3. The part of the charge in brackets.

4–6. The answers to defendants' points.

*Duff & Leggat* and *Marshall & Patterson*, for plaintiffs in error.—The action for McKean's death could be sustained only against those who sold the oil to him. If it had not been for the intervention of a third party, the defendants' negligence would have produced no injury to McKean ; the defendants therefore are not liable: Wharton on Negligence, sects. 134, 439, 440 ; Loser *v.* Clute, 51 N. Y. Rep. 494 ; Pennsylvania Railroad Co. *v.* Kerr, 12 P. F. Smith 353 ; Carter *v.* Town, 103 Mass. 507.

*W. O. Crawford, A. L. Pearson* and *W. D. Moore,* for defendant in error.—The persons who manage dangerous agencies by which others may be injured are responsible for negligence : Wharton on Negligence 781, 786; although there may be intervening agents: Norton *v.* Sewall, 106 Mass. 507 ; Thomas *v.* Winchester, 2 Selden 397 ; Dixon *v.* Bell, 5 M. & S. 198 ; Carter *v.* Town, 98 Mass. 567 ; Oil Creek & A. R. Railway *v.* Keighron, 24 P. F. Smith 316 ; Barney *v.* Bustenbinder, 7 Lansing 210. If one sells a dangerous and explosive fluid without giving notice of its character to a person ignorant of such character, he is liable: Wellington *v.* Downer Ker Oil Co., 104 Mass. 64. As to remote and proximate cause they cited Morrison *v.* Davis, 8 Harris 175 ; Lockhart *v.* Lichtenthaler, 10 Wright 164 ; Scott *v.* Hunter, Id. 195 ; Fleming *v.* Beck, 12 Id. 313 ; Pittsburg *v.* Grier, 10 Id. 54 ; McGrew *v.* Stone, 3 P. F. Smith 441 ; Pennsylvania Railroad Co. *v.* Kerr, 12 Id. 367.

Chief Justice AGNEW delivered the opinion of the court, January 6th 1876.

This was an action by the widow of James McKean against Elkins, Bly and Co., manufacturers of refined petroleum or carbon oil. McKean died of burns received, either from the explosion of a lamp carried in his hand, or from a fall breaking the lamp and setting the oil on fire. The action was founded on the allegation that the defendants wilfully made and sold the oil for lighting purposes, knowing that it was highly inflammable, explosive and unsafe, and therefore unfit for use as a light. The case went to the jury distinctly on this proposition, the judge having charged in these words : " If you should get beyond this question (to wit, the identification of the oil as made by the defendants), the next one which presents itself, and probably the most important question in the case, is, Did the defendants wilfully and maliciously put it upon

[Elkins, Bly & Co. *v.* McKean.]

the market knowing it to be, as she alleges in her declaration, unsafe, explosive, dangerous and unfit for illuminating purposes? because if they did not, under these allegations contained in this declaration or statement of her cause of action, there can be no recovery, and your verdict must be for the defendants." According to this instruction no question of mere negligence, in putting the oil upon the market, arose or was presented to the jury; but their verdict of necessity must be founded upon the evidence of a wilful sale of such unfit oil, with a full knowledge of its inflammable and explosive character. Upon this precise statement the fifth and sixth assignments of error arise, that the court refused to say there was no evidence which would justify the jury in finding that the defendants knowingly and wilfully sold the oil, and that it was highly inflammable, unsafe and dangerous; and also that under the pleadings and evidence the plaintiff was not entitled to recover. Upon a careful review of the whole evidence there appears to be none to justify the submission of the fact of the wilful sale by the defendants of such an explosive and unfit oil for burning purposes with such a wilful and malicious knowledge as that set forth in the instruction. Indeed there is no evidence what the precise business of Elkins, Bly & Co. was— what they manufactured, or what they sold; or that the oil in question coming from their house was sold as illuminating oil. That they made and sold illuminating oil appears from the barrels bearing their name, and the fire test, 110°, marked upon them, and from the testimony of J. M. Torrence; but that their business was confined to this branch alone does not appear. The contrary may well be inferred from the nature of the business of distilling crude petroleum in which various products are given off, used for different purposes. That the oil in the can out of which Steele & Hart filled McKean's lamp came from the manufactory of the defendants, may also be inferred from the evidence; but that this particular oil was sold by them as illuminating oil appears nowhere. The only testimony tending to identify the purchase of this oil, as from the defendants, is that of J. M. Torrence, the salesman of Arbuckle & Co., who sold the oil to Caskey. But Torrence does not undertake in the slightest degree to identify the sale of this particular oil, or to state for what purpose it was sold by the defendants, or to prove facts which would show that if it was the same oil, it was not delivered through accident, but must have been an intentional sale for lighting purposes of a product known by them to be below the proper fire test. The sum of his testimony is that Arbuckle & Co. were in the habit of buying large quantities at a time of oil in barrels, and having it delivered in small quantities to suit their sales, and that the books of Arbuckle & Co. show the sale of a barrel of oil to Caskey on the 11th or 12th of January 1873. But Caskey testifies that he frequently tried the

oil bought of Arbuckle & Co., and found it always to bear the proper test.　The only oil which did not bear the test was that found in the can a day or two after McKean's death, and whether this was the same oil with which McKean's lamp was filled is left to depend upon the contradictory testimony of Steele and the boy Fedder, as to when the new barrel of oil was pumped into the can by Steele. And if it were the same, we are still met by the difficulty that there is no evidence that this particular oil was sold by Elkins, Bly & Co. for illuminating purposes.　It may have been sold in a mistake, or may not have been sold as bearing the fire test of 110°, but as one of their other products.　Thus, upon the whole evidence, the turning fact of the case, viz.: a sale of this oil for illuminating purposes, with a guilty knowledge of its unfit and explosive character, is wanting in order to support the submission of the fact to the jury.　This must reverse the judgment.

The judgment must be reversed also on the third assignment of error, though I am inclined to believe it was an error of inadvertence.　"The first question (said the judge) will be, was the death of James B. McKean occasioned by the explosion occurring at the time, and in the manner claimed by the plaintiff?　In regard to this there can be no doubt whatever."　But if the testimony of Mrs. Emma Bear be believed (and it was for the jury to determine this), McKean's death was the result of his tripping over a piece of wood in the cellar, in consequence of which he must have fallen and broken his lamp; and was not the result of a mere explosion of the gas in the lamp.　The fact of such an explosion stood at the very threshold of the case, and in the face of this contradictory evidence it was too strong an affirmation of the fact, to tell the jury there could be no doubt that McKean's death was occasioned by the explosion at the time, and in the manner claimed by the plaintiff.　There is no doubt that his death was caused by the burning oil at the time and place claimed by the plaintiff, and this is probably all the learned judge meant.　But we must take the record for our guide, and when he said there was no doubt that the death was caused by the explosion in the manner claimed by the plaintiff, he asserted too strongly, in view of the contradictory evidence.

The other assignments of error are not sustained.　What McKean said as to the cause of the accident when found enveloped in the flames of the oil, or within a few minutes afterwards, was clearly competent evidence as a part of the res gestæ.　This is so fully reasoned out and sustained in the following cases, that nothing can be said to make it plainer: Tompkins v. Saltmarsh, 14 S. & R. 275; Deardorff v. Hildebrand, 2 Rawle 226; Cattison v. Cattison, 10 Harris 275.　The case of Fawcett v. Bigley, 9 P. F. Smith 411, was decided on a different principle.　That was an attempt to make the narration of an agent of a past transac-

tion evidence against his principal, and was not competent. It was especially so when the agent had an adverse interest to relieve himself by his statements of the consequences of his own negligence.

As to the second assignment of error, the reason given for excluding the evidence of the tests applied to the oil was unfounded. On the question of the identity of the oil in the can to which the tests were applied, the testimony of young Fedder and Steele were in direct contradiction. If Fedder were believed, Steele did not pump the new barrel of oil into the can until after the oil had been taken out which was the subject of the tests. The case must of necessity have gone to the jury on the facts.

Nor can the fourth assignment of error to the refusal to affirm the defendants' second point be sustained. The substance of that point is, that after the oil had passed from the defendants in large quantities to Arbuckle & Co., and from them in smaller quantities to Caskey, and from Caskey to Steele & Hart, who sold the lampful to McKean, there can be no recovery. The argument in support of this point is founded upon the alleged successive intervening liabilities of the persons through whose hands the oil had passed. But this proposition is unsound as a legal defence. The number of hands through which the oil had passed might furnish a strong argument on the question of indentity, and the guilty knowledge of Elkins, Bly & Co. as to this particular oil, but could not constitute a legal bar to recovery, if the identity of the oil and the guilty knowledge were made clear. Certainly one who knowingly makes and puts on the market for domestic and other use, such a death-dealing fluid, cannot claim exemption from liability for his terrible wrong, because he has sent it through many hands. The length of its passage may create a doubt of its identity, or that it was sent on its mission of destruction with a full purpose and knowledge of its dangerous qualities, but the facts being established, he cannot escape the consequences of his crime against society. The maxim, *qui facit per alium facit per se*, applies as clearly as other maxim, *sic utere tuo ut alienum non lœdas*. When the article is thrown into the current of trade on the faith of the affirmation of its manufacturers that it is a fit oil for light, and can be safely used in the family, or where it may be required for illumination, they cannot follow it, or avert its injuries, or determine how much of the responsibility is due to others. This is made more manifest by the testimony of Mr. Torrence, the salesman. He said: " We never draw the bungs. We sell the oil in perfect confidence, relying on the manufacturers. We sell it as we receive it." And so it may pass onward to the last person who retails it in the same confidence. A manufacturer who sells his product as an illuminating oil bearing the high and safe fire test of 110°, when in fact he knows that its fire test will not exceed 64 or 65

[Elkins, Bly & Co. *v.* McKean.]

degrees of Fahrenheit, and that this is a most explosive and unsafe oil for domestic use, can plead nothing in defence of this wilful, terrible wrong done to a confiding community. He bears within him a heart regardless of social duty, evidencing malice in its legal sense in a high degree. But while the circuit through which the oil has travelled may be insufficient as a legal bar, proof which sustains the fact of a guilty knowledge should be clear in proportion to the great wrong thus charged against one who may be innocent. We have already said that the evidence offered in support of the guilty knowledge in this case was insufficient to be submitted to the jury.

Judgment reversed, and a *venire facias de novo* awarded.

WILLIAMS, J., concurred in the reversal of this judgment on the third assignment of error, but would not concur on the fifth and sixth assignments.