J-A20027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| J.A. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| COUNTY OF MONTGOMERY | : | No. 2296 EDA 2024 |

Appeal from the Order Entered August 15, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2024-007797

BEFORE:   MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:              **FILED DECEMBER 2, 2025**

J.A. appeals *pro se* from the trial court's order sustaining the County of Montgomery's ("County") demurrer to J.A.'s petition for writ of *coram nobis*. We affirm.

On February 20, 2021, J.A.'s parents, C.A. ("Father") and I.A. ("Mother"), a licensed psychiatrist and a registered nurse, respectively, filed an Application for Involuntary Emergency Examination and Treatment ("302 Petition") pursuant to 50 P.S. § 7302. In the 302 Petition, J.A.'s parents alleged that J.A., who was 17 years old at the time, was severely mentally disabled and posed a clear and present danger of harm to others. Father stated in the 302 Petition,

> My son's paranoia, grandiosity, and dysregulated mood has
> severely escalated over the past 30 days—police had to be

_____

[*] Retired Senior Judge assigned to the Superior Court.

called 3 times to calm him and protect us[;] CYS and Mobile Crisis have also come to our home several times over [the] past 30 days[.] Today[, J.A.] would not allow his mother to leave the home to retrieve our mail from the post office[.] He threatened my wife (in my presence) that she could not leave the home without him. Then he jumped on the hood of her car while she was backing out and would not get off until police arrived. Mobile crisis workers witnessed the incident first hand. I was also present as he jumped on the car.

302 Petition, 2/20/21. For her part, Mother stated in the 302 Petition,

I tried to leave my home today to go get our mail at the post office and my son insisted that I could not go without him as he is paranoid and was convinced I would steal his mail. He physically attempted to block me from leaving the home. Then when I finally made it to my car and locked the doors, he jumped on the hood of my car as I was backing out of the garage and continued to voice threats that I could not leave. Last week, when he was unhappy about something I did[,] he told me "I would rue the day" and "Don't worry, a surprise is coming your way." He would not allow me to make him dinner a couple of weeks ago because he thought I was going to poison him.

*Id.*

The trial court accurately explained the events that followed the filing of the 302 Petition:

Pursuant to the Mental Health Procedures Act ("MHPA"), § 7303, a hearing took place on February 25, 2021 [("303 Hearing")]. [J.A.'s] father testified under oath confirming the validity of the allegations documented in the 302 Petition. Medical testimony supporting the commitment was provided by Dr. James Yi. Dr. Yi testified as to the examination of [J.A.] at the time of his commitment. Dr. Yi concluded that [J.A.] posed a risk of harm to himself and to others, and was in need of treatment. Based on the evidence set forth, the hearing review officer determined that [J.A.] was severely mentally disabled and in need of treatment.

- 2 -

[J.A.] received treatment at the Horsham Clinic for three weeks, after which he was released to an uncle with requirements for follow-up care.

A year later, on February 23, 2022, [J.A.] filed a *nunc pro tunc* Petition for Review of the certification in the Montgomery County Court of Common Pleas. A hearing on this Petition took place on May 10, 2022. At this hearing, testimony was received from [J.A.'s] father who told the court that he did not want to restate what he had said at the time of the initial commitment, and asked the court to rely on what he had said at the time, which represented his current views. The court reviewed this prior testimony. Dr. Yi also testified at this hearing and stated that his testimony at the prior 303 hearing reflected his opinion as of the date of the hearing.

Following this hearing, Judge Bernard Moore denied the Petition for Review. On May 13, 2022, [J.A.] filed a notice of [a]ppeal with the Superior Court. In support of the denial of the Petition for Review, Judge Moore issued a thorough opinion in which he wrote that [J.A.'s] involuntary commitment was supported by the credible testimony provided by [J.A.'s] father, and Dr. Yi, as well as the medical records provided to the court. On [April] 11, 2023[,] the Superior Court affirmed the trial court's order denying the Petition for Review. [**See J.A. v. Montgomery Cnty.**, No. 1362 EDA 2022, 2023 WL 2887355, at *1 (Pa.Super. filed Apr. 11, 2023) (unpublished mem.)]. [J.A.'s] Application for Reargument of this affirmance was denied. [J.A.] then filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court. On December 20, 2023, this Petition for Allowance of Appeal was denied.

Trial Court Opinion, filed 10/17/24, at 1-3 (footnote omitted).

On April 16, 2024, J.A. filed the instant petition for a writ of *coram nobis* seeking to have his certification for extended involuntary commitment vacated. In his petition, J.A. alleged that he obtained newly discovered evidence showing that the evidence presented at the 303 Hearing was false.

- 3 -

The alleged new evidence was in the form of two affidavits from J.A.'s parents recanting their initial allegations against J.A. and a video of the incident taken by Father. J.A. argued that this evidence showed that, contrary to the allegations in the 302 Petition and the evidence presented at the 303 Hearing, he did not jump on a moving vehicle or make threats to his parents. J.A. alleged:

> In late March and early April of 2024, respectively, [J.A.'s] parents . . . subject to the penalty of perjury, formally recanted by affidavit the material allegations in their 302 application and swore to the factual falsity of its representations. A video of the actual incident, unknown and extrinsic to this [c]ourt, supports those recantations and shows that the allegations in the 302 [Petition] are in fact patently fictitious. Those allegations had previously been accepted *prima facie* when the 302 application had been submitted in February of 2021, and were relied on as the basis for a subsequent 303 commitment application, and the basis on which both the 302 and 303 were certified. This recantation reveals . . . that [J.A.] was involuntarily committed to a psychiatric institution for twenty days on the basis of imaginary events and fictional conduct. . . .
>
> By this petition for a writ of *coram nobis*, [J.A.] seeks vacatur of his certification for extended involuntary emergency treatment under Section 303 of the Mental Health Procedures Act.

Petition for a Writ of *Coram Nobis*, filed 4/16/24, at 2.

J.A. attached the two affidavits to his petition for a writ of *coram nobis*. In Father's affidavit, Father recanted the following representations contained in the 302 Petition:

i. That [J.A.] had jumped onto a moving car;

ii. That [J.A.] had made threats to us;

iii. That [J.A.] had ever come into physical contact with anyone;

iv. That we had ever previously called the police to be protected from [J.A.]; and

v. That [J.A.'s] "paranoia, grandiosity, and dysregulated mood," to the extent it actually existed, had ever escalated to a such a degree that made him an imminent danger to anyone's physical safety or to his own.

Father's Affidavit of Recantation, 4/1/24, at ¶ 14. Father's affidavit stated that the following occurred on the date of the incident:

2. In February of 2021, my son, [J.A.], had been frequently receiving mail without my or my wife's permission. The items coming were mostly baseball cards.

3. Because he had told us that the money he was using to order them was earned by completing online surveys, we did not approve of his keeping anything he ordered with it.

4. Shortly before February 20, 2021, my wife and I placed a "hold" on the mail to stop my son from receiving items without our permission. This allowed us to pick up anything directed to our address at the post office and screen it for envelopes with [J.A.]'s name on it.

5. On February 20, 2021, [J.A.] advised us that mail had arrived for him and that he wished to accompany his mother to the post office so he could get it. My wife and I refused to allow him to come along, which prompted an argument.

6. After a long debate with him, I called Children and Youth of Montgomery County to help us reach a resolution. They informed me and my wife upon arrival that there was nothing they could do to assist us, because my son presented as calm.

7. At that time, I advised my wife to simply go to the post office. She then proceeded to the garage, and my son followed her. I followed behind him, as did the CYS workers. I pulled out my phone and began recording, not knowing exactly what was about to happen. [J.A.] sat on the hood of

- 5 -

the automobile which had been parked in there as his mother pressed the unlock button on her car key.

8. My son did not threaten to harm anyone during this incident at any point. When [J.A.] first sat on the hood, the car was static, the engine was off, and the vehicle was vacant.

9. After he had sat on the hood, his mother then entered the vehicle, and turned on the engine. She reversed the automobile a few inches to see if it would compel [J.A.] to get off of the hood, which it did not.

10. She then turned the car off and exited the vehicle. Not knowing what else to do, she and I called the Lower Merion Township Police.

11. When we spoke to the dispatcher, my son got off of the hood and walked back inside of the house. Police arrived thereafter, and all of us — me, my wife, the CYS workers, and [J.A.] — then had a conversation with the responding officers about what had happened. The police and the CYS workers then left, having taken no action.

12. At that point, my wife and I, still quite outraged by [J.A.]'s behavior, drove to Norristown to file commitment paperwork. Since he would not follow our rules or directions, we felt that he was ungovernable.

13. When I filled out the 302 application, I did not have the chance to process and consider everything that had occurred earlier in the day, as the events unfolded quickly, and there was regrettably little to no reflection or analysis possible as I wrote my statement. . . .

15. I did not think of giving the psychiatrist at the Bryn Mawr Hospital or at the Horsham Clinic my cellphone video of the incident, and I never gave it to the court. The footage does not support the (above-recanted) representations in the 302 application as to what actually occurred.

*Id.* at ¶¶ 2-13, 15.

The averments in Mother's affidavit were largely the same or similar as those in Father's affidavit, but she additionally recanted the following representations contained in the 302 Petition:

    i.      That [J.A.] had jumped onto a moving car;

    ii.     That [J.A.] had "voiced threats" while on the hood;

    iii.    That he had ever physically "blocked" me from leaving the house, entering the car, or walking anywhere;

    iv.     That [J.A.] had ever refused to eat my cooking under the belief that I was trying to "poison" him;

    v.      That we had ever previously called the police to be protected from [J.A.];

    vi.     That there was any indication or reason to believe that [J.A.] posed a danger of harm to himself or anyone else; and

    vii.    That any life-threatening emergency had existed and which necessitated an emergency involuntary psychiatric hospitalization.

Mother's Affidavit of Recantation, 3/31/24, at ¶ 18.

The County filed preliminary objections in the nature of a demurrer to J.A.'s petition for writ of *coram nobis*. On August 15, 2024, the court sustained the preliminary objections and dismissed J.A.'s lawsuit. This appeal followed.

J.A. raises the following issues:

    1. Whether the [t]rial [c]ourt erred/abused its discretion in concluding that the doctrine of *res judicata* bars [J.A.'s] Petition for a Writ of *Coram Nobis*.

    2. Whether the [t]rial [c]ourt's finding that "Petitioner bases his *Coram Nobis* petition solely on the fact that his parents signed affidavits of recantation", upon which it

held that the Petition fails to state a claim, is supported the record.

3. Whether the trial court erred in sustaining the County's demurrer and dismissing the *Coram Nobis* Petition despite (a) there existing no other remedy available to [J.A.] which would allow him to collaterally challenge the [t]rial [c]ourt's affirmance of the 303 certification rendered upon *de novo* findings of fact; (b) the Petition averring that [J.A.] had obtained new evidence demonstrating his actual innocence as to the conduct upon which the 303 certification was upheld in the form of two affidavits of recantation and supporting video footage; and (c) the Petition averring that [J.A.] had been duly diligent in seeking the new evidence earlier.

J.A.'s Br. at 4.

We address J.A.'s issues together since they challenge the trial court's order granting a demurrer in favor of the County. J.A. argues that his petition for a writ of *coram nobis* avers that newly acquired evidence, in the form of two affidavits of recantation by his parents and cell phone footage of the incident, demonstrates that the facts in the 302 and 303 applications were false. *Id.* at 9. J.A. maintains that "[i]t was unknown to th[e c]ourt when it upheld the 303 commitment certification in May of 2022 that the material facts on which it based its judgment were fictitious utterly, and that [he] had never actually engaged in any such behavior." *Id.* He asserts that the doctrine of *res judicata* is not applicable since "[t]he recantations and footage presented by [his c]oram [n]obis [p]etition were extrinsic [of] the record in the direct proceedings and has never been previously reviewed by any tribunal." *Id.* at 9, 12-13.

- 8 -

J.A. further takes issue with the trial court's statement in its Rule 1925(a) opinion that J.A.'s petition is based "solely on the fact that his parents signed affidavits of recantation." *Id.* at 13 (emphasis added). J.A. alleges that the court improperly disregarded the additional new evidence that was alleged in the petition — the video footage of the incident. *Id.* at 14-15. He also asserts that the court made improper credibility determinations of the recantations at the demurrer stage. *Id.* at 19. In his view, the court improperly focused on the underlying proceedings "despite it being utterly irrelevant to the [c]*oram* [n]*obis* [p]etition and whether the new evidence is or could be capable of demonstrating an error in fact." *Id.* J.A. concludes that the trial court's "hyper-fixation on the original factual findings in the direct proceedings and blind deference to it without regard for the new evidence does not in any way support its grant of the demurrer." *Id.* at 20.

Our standard of review is well-settled:

> As a trial court's decision to grant or deny a demurrer involves a matter of law, our standard for reviewing that decision is plenary. Preliminary objections in the nature of demurrers are proper when the law is clear that a plaintiff is not entitled to recovery based on the facts alleged in the complaint. Moreover, when considering a motion for a demurrer, the trial court must accept as true all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (cleaned up).

The writ of *coram nobis* "is generally regarded as an extraordinary remedy." ***Commonwealth v. Fiore***, 665 A.2d 1185, 1190 (Pa.Super. 1995). A writ of *coram nobis* may be "available to challenge the validity of a judgment based on facts not before the court when the judgment was entered." ***Commonwealth v. Descardes***, 136 A.3d 493, 494 n.1 (Pa. 2016) (citation omitted). It "lies only where facts exist extrinsic of the record, unknown and unknowable by the exercise of diligence at the time of its rendition, and which would, if known, have prevented the judgment either in its entirety or in the form in which it was rendered." ***Commonwealth v. Harris***, 41 A.2d 688, 690 (Pa. 1945) (italics added). The writ of *coram nobis* "is not intended to authorize any court to review and revise its opinions;" rather, it is only intended to enable a court "to recall some adjudication, made while some fact existed which if before the court would have prevented the rendition of the judgment, and which without any fault or negligence of the party was not presented to the court." ***Fiore***, 665 A.2d at 1190 (quoting ***Harris***, 41 A.2d at 691) (emphasis removed). The writ is not issued "simply because a witness later recants or changes his or her testimony, for there would be no finality to any conviction of crime if verdicts and judgments could be thus easily nullified." ***Id.*** (citation and internal quotation marks omitted).

Here, the trial court found that J.A.'s petition for a writ of *coram nobis* failed to state a claim for which relief could be granted. Trial Ct. Op. at 4. The court emphasized that a witness who later recants his testimony cannot support the grant of *coram nobis*. ***Id.*** (citing ***Fiore***, 665 A.2d at 1190). Since

- 10 -

J.A.'s petition was based on the affidavits of recantation by his parents, the court found that such affidavits did not support the grant of a writ of *coram nobis*. The court explained:

> These affidavits were filed approximately three and a half years after the[] parents filed a 302 Petition with the [c]ourt alleging that [J.A.] was a clear and present danger to others. . . . The affidavits contradict the facts presented at the time [J.A.] was hospitalized. [J.A.'s] father . . . testified under oath at the initial Section 303 hearing that his son needed immediate treatment and that he presented a danger to others. [Father] reaffirmed this testimony under oath over a year later at the hearing before Judge Moore. The affidavits of recantation of [J.A.'s] parents may signify a perhaps understandable change of heart approximately three and a half years after [J.A.'s] commitment. However, . . . granting [J.A.'s w]rit of [c]oram [n]obis simply due to this recantation cannot be the basis to alter or nullify the [c]ourt's prior judgment.
>
> In addition, Dr. Yi testified at the initial Section 303 hearing. He also testified at the hearing before Judge Moore, and his prior testimony was entered into evidence at that hearing. In addition to the testimony of [J.A.'s] father, Dr. Yi's testimony provided support for the decisions made by the Hearing Officer and by Judge Moore, and by the appellate courts who affirmed these decisions.

*Id.* at 5.

The trial court did not err. J.A.'s parents' affidavits of recantation cannot be considered grounds for the grant of a writ of *writ of coram nobis*. **See** **Fiore**, 665 A.2d at 1190. Additionally, the alleged video footage of the incident is related to the recantation evidence, for which a writ of *coram nobis* is not the proper remedy. Furthermore, J.A. failed to exercise due diligence. **See** **Harris**, 41 A.2d at 690. J.A. had more than three years to do his due diligence

- 11 -

to seek the recantation of his parents or to present any additional evidence.

We therefore affirm the order sustaining the County's preliminary objections.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/2/2025