## Commonwealth *v.* Rumage, Appellant.

484

Argued April 12, 1948.  Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Louis F. McCabe*, for appellant.

*Colbert C. McClain*, Assistant District Attorney, with him *John H. Maurer*, District Attorney, for appellee.

OPINION BY MR. JUSTICE LINN, May 24, 1948:

In December, 1946, William Rumage, living under the name of William McDonald, was arrested in Los Angeles, California, charged with the murder of Charles J. Blase in Philadelphia August 17, 1940. He was brought to Philadelphia, tried and convicted of murder of the first degree and, in accord with the penalty specified in the verdict of the jury, was sentenced to death. He appeals and complains (1) that evidence of the murdered man's declarations was received; (2) of errors in the instructions to the jury; (3) that the court

declined a request to appoint a physician "to determine whether [a witness under cross-examination] is in full possession of his faculties at this time". Judges OLIVER, SLOANE and MAWHINNEY, sitting in banc, heard and passed on the motion for a new trial. We all agree with their conclusion that the appellant has shown no ground for a new trial.

Blase, aged about 52, conducted a garage at 1526 West York Street, Philadelphia. About midnight, August 17, 1940, a Saturday night, he was asleep, seated in a chair in his garage. The appellant, Rumage, and an accomplice named McGrory, who had entered for the purpose of robbing Blase, shot him and escaped. Police took Blase to a hospital where he died August 19th, "without being able" in the words of appellant's brief, "to give any statement." McGrory was arrested on August 18th, pleaded guilty to an indictment for murder and, after hearing, was sentenced to life imprisonment.

1. Two policemen who happened to be in the neighborhood of Blase's garage, arrived there almost immediately after the shooting. One of them, Officer Baird, testified, "Charles Blase, the operator of the garage there, had just got up from the pavement where he had fell, after being shot." The officer testified that he "asked him how he had been shot, in the meantime taking him to the patrol wagon." The learned trial judge overruled an objection to receiving the declaration. The Assistant District Attorney then asked, "Q. Go ahead, officer. What did you say? Give us the exact words, as nearly as you can, of what was said to Mr. Blase by you, or in your presence by your brother officer, and what Mr. Blase said in return. A. As near as I can remember, we asked Mr. Blase how he had been shot, and he told us that two white men had attempted to hold him up and that he thought it was a joke. He had been napping and they startled him when they came in there. He thought it was a joke and he shoved the one fellow

away and he got shot. We placed him in the patrol wagon and on the way to the hospital we asked him if he knew the two fellows who had held him up and he said he didn't know them. Q. You were in uniform? A. Yes, sir. Q. And your brother officer, Bonneville, was in uniform? A. Yes, sir." The other policeman, Bonneville, repeated substantially the same testimony, from which the following is taken: "Q. Do that, officer, as well as you can recall. What did you say to Mr. Blase and what did he say to you, at the scene? A. That is all I remember saying. I asked him who shot him and he said he didn't know, but he thought it was a joke. He pushed one of the men away. Q. You said what about a 'hold-up'? A. Mr. Blase, he said it was a hold-up, but he thought it was a joke, so he pushed the men away." Counsel for appellant contends that the declarations should not have been received. We think the evidence is within the res gestæ rule.

It is unnecessary to repeat our discussions of the rule;[*] it is sufficient to state why the evidence is admissible in this case. The learned trial judge, in the exercise of a discretion vested in him could hold, as he did, that the circumstances were sufficient to raise a reasonable presumption that the declarations were spontaneous utterances springing out of the "hold-up." Such declarations are not objectionable because made in response to questions: *Com. v. Harris*, 351 Pa. 325, 336, 41 A. 2d 688.

Officer Simon of the Philadelphia Police Homicide Squad, testified that, after his arrest, Rumage gave him and another officer a voluntary statement which was taken down and signed by Rumage. In the course of

---

[*] See *Com. v. Harris*, 351 Pa. 325, 41 A. 2d 688; *Allen v. Mack*, 345 Pa. 407, 28 A. 2d 783; *Com. v. Stallone*, 281 Pa. 41, 126 A. 56; *Com. v. Puntario*, 271 Pa. 501, 115 A. 831; *Com. v. Gardner*, 282 Pa. 458, 128 A. 87; *Eby v. Travelers Ins. Co.*, 258 Pa. 525, 102 A. 209; *Com. v. Calderbank*, 161 Pa. Superior Ct. 492, 55 A. 2d 422; *Com. v. Cupps*, 157 Pa. Superior Ct. 341, 43 A. 2d 545.

that statement he said that he and McGrory had been together all of that Saturday afternoon and evening. McGrory went to his father-in-law's house and obtained a revolver. Rumage described going with McGrory to a garage at 1811 West Master Street and obtaining money from the attendant there at the point of a gun. He stated that from there they went to Blase's garage and that he, Blase, started to wrestle with me and "the gun went off." The next day he "got a freight. I was told I was wanted and left the city." Asked "What became of the firearm that was used in the shooting? A. I don't know. Q. But you distinctly fired a shot at this man? A. Yes. Q. Did you secure any money from Mr. Charles Blase? A. I don't remember."

Rumage took the stand in his own defense. He said that he was known as William McDonald and had also used the name Murphy. He stated that he signed the statement referred to by Officer Simon. He denied having been with McGrory on August 17th. Asked why he left town if he had done nothing, he replied that "The police were after him." He was asked, "Q. Well, if you had done nothing the police wouldn't have been after you, would they? A. I was in a fight the other night—that was a Thursday night—and I figured they were after me for that." His statement and his evidence with respect to it were of course for the jury, and no complaint is made of the manner in which it was submitted.

2. Two assignments of error complain of the following quotations from the charge: "If you are convinced beyond a reasonable doubt that Charles Blase was killed while this defendant and another man were in the act of committing or attempting to commit a robbery, then the law says that is murder of the first degree."

"The next matter is that I have referred a number of times to the fact that to constitute this murder a murder of the first degree, it is essential that it have been committed in the perpetration of a robbery. Now, of

course, by that robbery I naturally referred to either a robbery or an attempted robbery at the garage owned by Mr. Blase. That, I think, would be clear to you. It would not be some other robbery. Was the murder with which we are concerned directly connected with a robbery at that place?" The objections do not merit discussion in the light of the whole charge; the jury could not possibly have been confused by the use of the word murder instead of killing or homicide.

3. When the witness, Thigpen, was on the stand counsel for appellant asked "that the witness be examined by a physician under the direction of the Court to determine whether he is in full possession of his faculties at this time." To that the court stated, "I think the jury is capable of knowing whether he is sufficiently in possession of his faculties to testify. That is the important thing here. It isn't a question of whether a man has had a drink or whether he hasn't had a drink." We see no abuse of discretion. The witness was cross-examined at great length by counsel for the appellant.

The assignments of error are overruled and the judgment is affirmed.