Commonwealth *v.* Soudani, Appellant.

Argued September 21, 1959.   Before RHODES, P. J., HIRT, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (GUNTHER, J., absent).

*Marjorie Hanson Matson,* for appellant.

*Eugene G. Kitko,* Assistant District Attorney, with him *Joseph S. Ammerman,* District Attorney, for appellee.

OPINION BY HIRT, J., November 11, 1959:

The defendant was convicted of aggravated assault and battery, and of assault with intent to kill, both offenses arising from the same circumstances.   The lesser penalty imposed for the misdemeanor was made

to run concurrently with the sentence for the felony. This is the defendant's appeal from the judgments of sentence imposed.

In the light of the verdict these facts may be taken as established. The defendant and Alice E. French were married on May 20, 1948, somewhat more than one year after he first came to the United States. He was a native of Jordan in the Middle East and is a Moslem; she was born here and is a Christian Protestant. Differences in religion and in their nationalistic background had some effect, but there were other causes which led to the final separation on December 6, 1958 when she left her husband. During their married life they had lived in Toronto, Canada, in Egypt, on Long Island and in Buffalo, New York. They moved to Clearfield, Pennsylvania, in 1957 where the defendant secured employment in a responsible position with Curtis Wright. At the time of the separation the family were living in a house which the defendant had purchased when they moved to Clearfield. There were two children born to the marriage. The defendant, to harass his wife, had ordered a discontinuance of all utilities serving the house, including telephone, water and electric service. This was the immediate reason for her leaving the marital home but there were other and more serious causes leading to the final separation. He had, over a long period, subjected her to physical abuse. She testified that because of his brutal treatment a third child was still-born on February 11, 1958. She had ground for divorce; on this record, he did not. And he wanted a divorce because of his interest in another woman. When his wife refused "to give" him a divorce the defendant threatened to kill her. He, according to her testimony, was abusive daily, and she left him because she was afraid of him.

In an action brought by her, the defendant agreed to an order of $250 per month for her support and the support of their two children. In the order, the court, we assume by agreement also, awarded custody of the children to their mother; the defendant to have the children on Saturdays and Sundays and on every Wednesday from 6:00 to 7:45 p.m. On Wednesday, December 24, 1958, the defendant drove his car to the apartment house where his wife lived. He appeared at 6:00 o'clock p.m. precisely, and Mrs. Soudani, who was expecting him, delivered the children to him. When the children went out to his automobile the defendant returned to the apartment door with Christmas presents for the children. He was able to induce his wife to open the door, which she had locked, on the pretext that he wanted the presents put under the Christmas tree. His wife testified: that he had a carton, containing two boxes with Christmas wrapping, under one arm and that he came up the three steps to the entrance to her apartment so quickly that she was unable to close the door behind her; that there was a "flash of light" from a "round and shiny" object "like a hammer" in his other hand with which he, without warning, struck her on the side of her head; a second blow on the head knocked her to her knees on the porch steps; there the defendant struck her again and again; she was found almost immediately thereafter by a neighbor, a Mrs. Lloyd, who lived in the same building and who had heard the scuffling and her screams. Mrs. Lloyd had observed a man walking from the porch to a parked automobile, but she was unable to identify him because of the darkness. A Mr. Robbins, who worked with the defendant and knew him well, and who lived nearby, testified to the same effect. Mrs. Lloyd found defendant's wife sitting on the doorstep of the Lloyd apartment with her hands to her face,

bleeding profusely, and this witness testified that "she screamed to me to call the police" and a doctor; the witness was unsuccessful in her attempt to put through a call to the police and when she returned from the telephone, she found Mrs. Soudani lying face down inside the door on the floor of the Lloyd kitchen, it was still but a few minutes after 6:00 o'clock and Mrs. Soudani then said: "Call the police; get a doctor; please help me." And she also said "Sami beat me", a statement that clearly was admissible as res gestae. *Commonwealth v. Stallone*, 281 Pa. 41, 45, 126 A. 56; *Commonwealth v. Gardner*, 282 Pa. 458, 465, 466, 128 A. 87.

Tarik Soudani, the older of the two young sons, qualified as a witness, although but 7½ years old, and he testified: that when his father returned to the automobile after taking the box of Christmas presents to the door, he did not appear excited; but that when they reached his apartment he shunted the two boys into a bedroom and closed the door; that the younger of the boys opened the door and they then saw their father getting undressed to his undershirt in the living room; the witness said that he noticed something red on defendant's finger and his father subsequently said he had cut his hand; the witness saw his father washing something at the sink and then put the object into his tool box; the boy testified that he thought it was a hammer. The police arrested defendant in his apartment about 7:30 p.m. that evening and took him to jail. On the way the police deposited the two children with a Mrs. Myers, a friend, who cared for them in her home until Mrs. Soudani on her discharge from the hospital, was able to return to her apartment.

Dr. N. W. Yingling, examined Mrs. Soudani at a hospital at 6:45 p.m. on the night of her injury. He testified that she then was in "normal shock" but was

rational and "not too confused"; he found 10 separate lacerations over the scalp and bruises over her shoulders and across the front of both forearms; her left hand also was lacerated. An x-ray examination disclosed a fracture of the left skull. She was treated in the hospital from December 24, 1958 to January 16, 1959. At the time of trial (February 9, 1959) Dr. Yingling was still treating this woman; at that time she was wearing colored glasses because she could not tolerate bright light, but she was showing improvement from other effects of the skull fracture. The doctor could not identify with certainty the kind of weapon that caused the injuries but he said that the "lacerations were typical [of injuries] from a small hard instrument."

The police on the night of the arrest took a hammer (which appeared to have been recently washed), a wrench and a pair of pliers from defendant's tool box in his apartment, and these, together with a suit of defendant's clothes, were sent to the Federal Bureau of Investigation, along with the cardboard carton and the boxes containing the Christmas presents, for laboratory examination. An FBI technician who had made the tests, testified that the results were negative except that he found human blood on the carton and the boxes in such quantity that it was possible for him to establish the type of the blood as group A. He also identified red stains on the hammer as human blood.

When Mrs. Lloyd saw the bleeding woman on the floor she, at once, ran out of her kitchen to the Belin house in the rear of the apartment building. She immediately returned to her apartment with Mrs. Belin who was accompanied by her daughter, Molly. Molly was a student nurse and for 45 minutes until the ambulance came she administered first aid to the injured

woman. During that period Molly attempted to keep the injured woman talking, because of a suspected injury to her brain. Molly testified that "Mostly she said: 'Please get my boys back.'" But in response to the question: "Did she say anything else?" Molly answered: "I had asked her what happened, and she said: 'Sami beat me.' I said: What did he hit you with? and she said: 'a hammer.'" It was seriously argued before us that the admission of this testimony over objection constituted reversible error because not near enough, in point of time, to the main occurrence, as to be admissible under the rule of res gestae. We well might refuse to consider this contention because the question was not raised nor argued in the court below (*Commonwealth v. Watts,* 179 Pa. Superior Ct. 398, 116 A. 2d 844) and is not comprehended within the defendant's statement of questions involved in this appeal. Cf. *Com. v. Boyle,* 108 Pa. Superior Ct. 598, 603, 165 A. 521. We however have considered the contention and find no merit in it. The fact that a material part of the declaration of the victim in this case was made in response to Molly's question addressed to her did not destroy the quality of spontaneity essential to its admission. *Commonwealth v. Harris,* 351 Pa. 325, 336, 41 A. 2d 688. Moreover the law is settled that "No fixed time . . . from the main occurrence can be set up as a rule to determine what utterances shall be admitted. Each case must depend on its own circumstances." *Commonwealth v. Gardner,* supra. In *Commonwealth v. Stallone,* supra, where it was said in effect that the time element is important but not conclusive, declarations by the injured person made "between fifteen minutes and half an hour" after the shooting were properly received. Here the fact that Mrs. Soudani was in shock although in "normal shock" from the skull fracture would have

some bearing upon the question of the spontaneity of her utterances over a more extended period. But it was a reasonable inference from the testimony under the circumstances that the declarations came near the beginning of the 45 minutes period above referred to, rather than near its end. The declarations in our view were clearly admissible under the rule of res gestae.

There is no merit in appellant's contention that the court is chargeable with fundamental error, requiring a new trial, "in failing adequately to define and distinguish the offenses with which appellant was charged." Of course it is the duty of the trial judge to instruct the jury adequately as to the nature and character of the crimes on trial so that the facts as found may be properly applied. *Commonwealth v. Brown,* 58 Pa. Superior Ct. 300, 308. Here the trial judge defined aggravated assault and battery in the language of the statute. Section 709 of the Act of June 24, 1939, P. L. 872, 18 PS §4709. The statutory definition is comprehensive and is stated in clear language, exemplifying the offense, which can be understood by anyone. The same may be said of the language of the statute defining the felony—assault with intent to kill. Section 710 of The Penal Code, 18 PS §4710. The trial judge instructed the jury that a finding of malice was essential to a conviction of the misdemeanor, and felonious intent to convict the defendant on the second count of the indictment. And reference was made to the testimony on which the Commonwealth relied to prove malice and intent. The defendant was represented by competent counsel at the trial and if, in any view, more comprehensive descriptions of the crimes were desired, trial counsel should have requested them. *Commonwealth v. Tracey,* 137 Pa. Superior Ct. 221, 226, 8 A. 2d 622. It is too late now for the defendant, through other counsel, to complain on that score.

We are also unable to agree with appellant that the charge of the court was "basically unfair and prejudicial to the defendant." The specific complaint is that the court failed "to review adequately the case for the defense." The testimony of fourteen witnesses comprised the case for the Commonwealth. There was but one witness for the defense—the defendant himself whose defense consisted in a categorical denial that he assaulted his wife. There is no question that defendant was at the door of his wife's apartment immediately before the assault; he admits it. And the court fairly reviewed all of the Commonwealth's testimony on the question of the identity of the defendant as the offender. When as here the defense is a bald denial of the charge, it is difficult to apprehend what more can be said by a trial judge than to submit the question of the defendant's credibility to the jury. This was done fairly in this case. In this connection the following from the opinion in *Commonwealth v. Becker*, 326 Pa. 105, 112, 191 A. 351, is pertinent: "If the court referred at greater length to the testimony of the Commonwealth, it was only because more evidence was offered on that side: Commonwealth v. Riggs, 313 Pa. 457, and cases there cited. This objection, as applied to the facts in the instant case, is little more than a complaint that the trial judge did not argue defendant's cause to the jury: Commonwealth v. Hadok, 313 Pa. 110." Cf. *Commonwealth v. Beauman & Perlman*, 78 Pa. Superior Ct. 336, 341. However, if additional instructions were considered desirable there should have been a request for additional comment by the trial judge.

Judgments of sentence affirmed.