## Commonwealth *v.* Cheeks, Appellant.

Argued January 13, 1966.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

reargument refused November 7, 1966.

*Edward K. Nichols, Jr.,* with him *Alexander Brodsky,* for appellant.

*Joseph M. Smith,* Assistant District Attorney, with him *Benjamin H. Levintow* and *Vincent Veldorale,* Assistant District Attorneys, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 27, 1966:

On May 22, 1964, after a nine-day trial, the appellant, Bernard Cheeks, was convicted by a jury of murder in the first degree and punishment was fixed at life imprisonment. Post trial motions were overruled and sentence imposed in accordance with the jury's verdict. From the judgment of sentence, this appeal was filed.

The crime involved the robbery and stabbing on October 11, 1963, of Joe Henry Howell by four young males on a public street in Philadelphia. Following the occurrence, Howell, 57 years of age and slow of gait as the result of a stroke, walked directly to his sister's home about five blocks distant. When he arrived, his appearance was described "like he had been beat" and "crying." Very shortly after his arrival, he told his sister that four unknown boys had assaulted and robbed him, and that one of the boys was wearing a patch over one eye.[1] Because he urinated in his clothes, it was insisted that he go to the upstairs bathroom and change into pajamas. Upon emerging from

---

[1] These were apparently the victim's first coherent statements to anyone.

the bathroom, he called to his sister and said, "those boys did cut me." She then noticed he was bleeding slightly from the abdomen in the area of the navel. His statements to his sister, as above described, were admitted in evidence over objection at trial as part of the res gestae. This is assigned as error.

The rule permitting res gestae declarations to be introduced in evidence is an exception to the hearsay rule. The principle is based upon the rationale that a spontaneous declaration of an individual who has recently suffered an overpowering emotional and shocking experience is likely to be truthful. See, 1 Henry, Penna. Evidence, §466 (1953). Such evidence is limited to declarations supporting the conclusion that the statements were spontaneous utterances of thought created by, or emanating from, the litigated act, and so near in time thereto as to exclude the possibility that they were the product of premeditation or design. See, *Commonwealth v. Noble,* 371 Pa. 138, 88 A. 2d 760 (1952) ; *Commonwealth v. Rumage,* 359 Pa. 483, 59 A. 2d 65 (1948) ; and, *Commonwealth v. Cupps,* 157 Pa. Superior Ct. 341, 43 A. 2d 545 (1945). No definite time limit, or distance from the site of the crime, has been fixed by the courts in determining what spontaneous utterances are admissible as part of the res gestae. Each case has been judged on its own facts and circumstances : *Commonwealth v. Stokes,* 409 Pa. 268, 186 A. 2d 5 (1962), and cases cited therein. The length of time which has elapsed between when the declarations were uttered and when the occurrence took place is only one element to be considered in determining their spontaneity. See *Commonwealth v. Noble,* supra, and *Commonwealth v. Harris,* 351 Pa. 325, 41 A. 2d 688 (1945).

In the instant case, the precise time sequence of events is not ascertainable from the record. However, it is clear that the entire series of events took place

within forty-five minutes or, at the most, one hour. The attack occurred after eleven p.m. o'clock. The decedent arrived at his sister's home no later than 11:30 p.m. o'clock. Reconstructing the picture, as disclosed by the testimony, the conclusion is inevitable that the statements were spontaneously uttered, were directly related to the event and were not the result of reflection or design. Under these circumstances, their admission in evidence was not error. The fact that the statements were not made *immediately* after the assault is not, in itself, controlling. See, *Commonwealth v. Stokes,* supra, and *Commonwealth v. Harris,* supra. This Court has previously approved the admission in evidence of such declarations when the time period involved was as long or longer than that herein. See, *Commonwealth v. Soudani,* 190 Pa. Superior Ct. 628, 155 A. 2d 227 (1959), aff'd 398 Pa. 546, 159 A. 2d 687 (1960), cert. denied 364 U. S. 886 (1960); *Commonwealth v. Stallone,* 281 Pa. 41, 126 A. 56 (1924); and, *Commonwealth v. Werntz,* 161 Pa. 591, 29 A. 272 (1894). See, also, *Commonwealth v. Calderbank,* 161 Pa. Superior Ct. 492, 55 A. 2d 422 (1947).

The next contention is that the evidence did not establish that the stab wound was the cause of death.

The Commonwealth's medical trial testimony may be summarized as follows: Upon Howell's admission to the hospital at 2:10 a.m. o'clock in the early morning following the occurrence, an examination disclosed an obvious penetrating wound of the abdomen in the area of the umbilicus. Since the extent of the wound was not ascertainable from an exterior examination, an operation was deemed necessary and was performed. It disclosed a puncture of the abdominal cavity, measuring about one inch in length, and it also disclosed that the only interior damage therefrom was to the mesentery, a leaf of tissue attached to the intestines through which the blood vessels course and supply nourishment

to these organs. However, during the operation the whole gastrointestinal tract was manually handled and checked for wounds.

In order to prevent a common post-operative complication,[2] a "Levin" tube was inserted in the patient through the nostril to the stomach to suction off damaging secretions and air that might accumulate in that organ. Following the operation and after coming out of the anesthesia, the patient, Howell, was uncooperative, disorientated, resisted treatment, demonstrated delirium tremens, hallucinations, wouldn't stay in bed and wandered into the hospital halls and the rooms of other patients. Out of precaution, he was then tied to the bed. However, he managed to pull out the tube three times and developed hiccups.[3]

On October 15th, the abdomen became markedly distended. This followed a period during which the patient had continued to be uncooperative and had again extracted the tube. However, the abdominal distention was described as "secondary to the operation, and not secondary to pulling out the tube." It was also stated that the operation itself "produced a temporary paralysis in the intestine which caused accumulation of the gas and fluids and it was necessary to remove the fluids to keep the man alive."

As a result of the above described complication, another longer "Cantor" tube was inserted. This had a bag of mercury at the end for weight purposes and had

[2] Following such an operation, the intestines and bowels frequently do not function normally causing secretions and air to remain unduly in the stomach, resulting in abnormal and possible serious consequences.

[3] One medical expert stated that this condition and behavior was in no way attributable to the operation or medication. However, another such expert testified, that the abnormal retention of fluids and gases in the stomach produced a chemical reaction and the mental confusion, which in turn caused the confused behavior of the patient and resulted in his pulling out the tubes.

to be positioned under a fluoroscope or x-ray machine. Howell pulled out this tube on at least two occasions, the second of these instances occurred on October 18th, in the x-ray room, just as the process of inserting the tube was about completed. As a result, a gag reaction immediately followed, causing a large amount of gastric material in the stomach to be sucked into the lungs. A tracheotomy was hurriedly performed without material result. Howell expired about 1:30 p.m. o'clock on the same day from suffocation, resulting in heart stoppage due to lack of oxygen in the lungs.

Under this proof, it is our studied conclusion that the question of causal connection was for the jury to resolve. The fact that the stabbing was not the immediate cause of death is not controlling. See, *Commonwealth ex rel. Peters v. Maroney,* 415 Pa. 553, 204 A. 2d 459 (1964), and *Commonwealth v. Williams,* 304 Pa. 299, 156 A. 86 (1931). As pointed out in *Peters,* supra, one charged with homicide cannot escape liability merely because the blow he inflicted is not mortal, or the immediate cause of death. If his blow is the legal cause, i.e., if it started a chain of causation which led to the death, he is guilty of homicide. See, *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A. 2d 125 (1950); *Commonwealth v. Eisenhower,* 181 Pa. 470, 37 A. 521 (1897); and, *United States v. Hamilton,* 182 F. Supp. 548 (1960).

In this case, the stabbing necessitated the operation; the operation was the direct cause of the stomach complication and abdominal distention; the insertion of the tubes was required to alleviate this condition and to save the victim's life. The fact that the victim, while in a weakened physical condition and disorientated mental state, pulled out the tubes and created the immediate situation, which resulted in his death, is not such an intervening and independent act sufficient to break the chain of causation or events between

the stabbing and the death. See, Beale, The Proximate Consequences of an Act, 33 Harv. L. Rev. 633 (1920); Levitt, Cause, Legal Cause & Proximate Cause, 21 Mich. L. Rev. 34 (1922); Edgerton, Legal Cause, 72 U. Pa. L. Rev. 211 (1924); and McLaughlin, Proximate Cause, 39 Harv. L. Rev. 149 (1925).

The next assignment of error concerns the admission in evidence at trial of testimony of incriminating statements by the appellant while in police custody. In these statements, Cheeks admitted participation in the robbery, detailed the occurrence, and said that he was the one who stabbed Howell, but claimed the stabbing was accidental. Admittedly, no warning of the appellant's rights to remain silent or to have the assistance of counsel was given before or during the questioning. The case of *Escobedo v. Illinois,* 378 U. S. 478 (1964), is cited in support of appellant's contention that the evidence was (in the absence of such warnings) constitutionally tainted and, therefore, inadmissible. However, since the instant trial commenced (and in fact terminated) before June 22, 1964, the date of the *Escobedo* decision, that decision does not apply: *Johnson v. New Jersey,* 384 U. S. 719 (1966).[4] The testimony was not inadmissible solely on the ground that the warnings mentioned were not given. See, *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966). However, the question remains, were the statements freely and voluntarily made, or were they coerced and those

[4] In *Commonwealth v. Negri,* 419 Pa. 117, 213 A. 2d 670 (1965), as a result of the decision of the United States Court of Appeals in *United States ex rel. Russo v. New Jersey,* 351 F. 2d 429 (3d Cir. 1965), we ruled that *Escobedo* did apply to all cases not "finally" decided before *Escobedo* was announced. However, we specifically stated in *Negri* that this was effective only until the United States Supreme Court spoke some further word on the subject. *Johnson v. New Jersey,* supra, is the final word on this question and we accept it as controlling.

of a pressured and overborne individual. This question must be determined in the light of all the circumstances disclosed by the record and the constitutional standards enunciated by the United States Supreme Court prior to *Escobedo*. See, *Johnson v. New Jersey,* supra. So considered, it is our conclusion that the voluntariness issue was for the jury.

The record discloses the following in connection with Cheek's statements to the police.

He was first briefly questioned by an investigating officer on the night of October 24th, although at the time there was no evidence connecting him with the crime. On this occasion, he appeared to be intoxicated, wore a patch over his right eye, and had an open knife concealed in his clothing. His shirt was stained with human blood. He was belligerent, refused to talk and insisted upon fist fighting with the questioning officer. At no time did he indicate any desire to see an attorney. He was remanded to the Pennypack House, a detention home for juveniles. Cheeks was seventeen years of age.

On October 29, 1964, Craig Stevens Smith and Joseph Beard gave written statements to the police admitting participation in the Howell robbery, and implicating Cheeks as another involved, and as the one who did the actual stabbing.

On October 30th, about 3:45 p.m. o'clock, Cheeks was taken from Pennypack House to police detective headquarters, shown the statements of Smith and Beard and questioned concerning the crime, until 4:30 p.m. o'clock. He refused to talk.

From 5:30 p.m. o'clock to 6:15 p.m. o'clock, he was questioned by a juvenile court officer and denied any involvement.

At 8:30 p.m. o'clock, he was permitted to talk with his girl friend, who urged him to tell the truth. Shortly thereafter, he orally admitted his guilt. Following

this, he detailed the occurrence under police questioning. The questions and answers were recorded on a typewriter.[5] When the written statement was completed, about 10:30 p.m. o'clock, he read it and signed each page.

When testimony of Cheek's statements to the police began at trial, the trial judge immediately conducted a hearing out of the presence of the jury on the voluntariness thereof. At this hearing, Cheeks made no effort to refute the testimony of the Commonwealth relating to this issue. The judge found the statements to be voluntary and ordered their admission in evidence. In his own personal testimony before the jury, Cheeks denied the truthfulness of the statements and stated that he made them because the police threatened that if he didn't they would arrest his girl friend and her mother, and take an expected child (his girl friend was pregnant with Cheek's child) away from them. No other explanation of why he made the statements was offered. Cheeks did not say that he was abused in any way, or that he asked for and was denied the assistance of counsel. The investigating police officer, charged with making the threat, categorically denied it. The issue of voluntariness was submitted and left to the jury under careful instructions of the trial court.

Under the above record established circumstances, we cannot declare as a matter of law that the admissions were coerced. The question was one properly left to the jury to resolve. See, *Commonwealth v. Patrick*, 416 Pa. 437, 206 A. 2d 295 (1965) ; *Commonwealth v. Coyle*, 415 Pa. 379, 203 A. 2d 782 (1964) ; *Crooker v. California*, 357 U. S. 433 (1958) ; and, *Cicenia v. Lagay*, 357 U.S. 504 (1958).[6] The fact that

---

[5] Before this questioning began, Cheeks was warned that anything he said could be used against him in court.

[6] Although *Crooker* and *Cicenia* were overruled in *Miranda v. Arizona*, 384 U.S. 436, they are apposite with respect to a May 1964 trial: *Johnson v. New Jersey*, supra.

Cheeks was not fully warned of his constitutional rights, while a significant factor in considering the voluntariness of the statements, was not conclusive. See, *Davis v. North Carolina,* supra.

We have carefully considered each and every asserted assignment of error, and find nothing in the record to warrant the grant of a new trial or an arrest of judgment.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE COHEN :

In *Commonwealth v. Root,* 403 Pa. 571, 580, 170 A. 2d 310, 314 (1961), we held that "the tort liability concept of proximate cause has no proper place in prosecutions for criminal homicide and more direct causal connection is required for conviction." A reading of the majority opinion discloses that in concluding that defendant's act was the proximate cause of death and that defendant is criminally responsible therefor, a weighty reliance has been placed upon precedent grounded upon the application of the tort liability concept of proximate cause. This reliance blatantly violates the principles of *Root.* I, accordingly, dissent.