Commonwealth *v.* Joseph, Appellant.

Argued November 27, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Samuel Dashiell,* with him *Ronald J. Brockington,* for appellant.

*Linda Conley,* Assistant District Attorney, with her *Milton M. Stein,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, May 4, 1973:

On May 23, 1970, at about 1:30 p.m., eighty-four-year-old Edith Seal was knocked down and robbed of her pocketbook, while walking along the 2700 block of North Park Avenue in Philadelphia. As a result of being knocked down, Miss Seal sustained a fractured hip and complications developed which, according to

the Commonwealth's expert testimony, ultimately led to her death on July 25, 1970.

Mrs. Rosa Wilson and her husband, who live at 2727 North Park Avenue, witnessed the crime. According to Mrs. Wilson, Miss Seal was knocked down by a single black male, who then took her pocketbook. After the purse was taken and Miss Seal was pushed to the ground, Mrs. Wilson saw a single male run through an alley which runs from Park Avenue to Thirteenth Street. Mrs. Wilson went to help the victim and asked Miss Seal whether she had her keys with her and, according to Mrs. Wilson, Miss Seal replied "that he took her pocketbook". According to Mrs. Wilson's testimony, neither she nor Miss Seal had seen more than the single assailant involved in the attack.

However, one Ulysses Osborne, who lived at 1221 West Silver Street, in the same neighborhood as the 2700 block of North Park Avenue, testified that he saw four boys leave the house at 1225 West Silver Street shortly before the purse snatching occurred, and he further testified that, shortly after the crime, he heard someone shouting and saw the same four boys running back into the house. According to Mr. Osborne, one of the four boys was carrying a brown bag with what appeared to be a pocketbook sticking out of it when he went running back to the house. Soon afterward, Mr. Osborne saw one of the boys leave the house with the brown bag in his hand, go up toward Twelfth Street, turn in behind a church and garage there and then return empty-handed.

As a result of Mr. Osborne's tip, the police soon arrived at 1225 West Silver Street. Upon entering the building, they encountered appellant, eighteen-year-old Carl Joseph, who was wearing no shirt, was sweating profusely, and appeared to be breathing heavily. The police then arrested appellant and three other boys who were in the house. One of the police officers later

recovered Miss Seal's pocketbook, which he found in the bushes behind a garage located in the alley directly opposite 1225 West Silver Street.

Later appellant gave the following statement to the police:[1] "Q. Carl will you go on in your own works and tell us what you know concerning this incident? A. On Saturday 5-23-70 I went over to Norman Washington's house on Colorodo St. it was about 7:30 am we went out to see what we could find to make some big money. We walked around and then we went to my Grandfathers job at Marshal and Diamond St. I picked up a bag of Clothes from my Grandfather then we walked back to Germantown Av. then we went back to my crib on Silver St. and laid around for awhile. Then we went back out I left the clothes at the crib but took the bag with me. We went back up the Av. this was about 12:00 a.m. or 1:00 p.m. we met Steve Williams coming off Germantown Av. we met hi near Germantown and Lehigh Av. We all me, Norman and Steve were walking up Lehigh Av. when we met Bub this was around 11th and Lehigh Av. we stood and talked a couple minutes. This is when the old lady past us Bubles said he was going to snatch her pocket book. Me and Norman said she did not have any money and Bub said I hit her before and got some money. We continued walking up Lehigh Av. and I cut off at 12th St. Bubles walked ahead of us following the old lady. Norman and Steve followed a little behind him. I went up the 1200 blk of Silver st and I could see Bubles through the yards on Lehigh av. I saw Norman and Steve and asked them wheres Bubles Norman said he moving up I went up to 13th and Silver St and waited a few minutes and then Bub came through the alley off of Park Av. and he had the ladies pocketbook

---

[1] The statement is presented here exactly as it appears in the record.

I opened the brown paper bag and he threw the pocketbook in the bag I dropped the bag and kicked it under a car I walked about ten ft. and I saw some guy pick up the bag so I went back and got it I told him it was my brothers then Bub and I ran to the house Norman and Steve had come up 13th St. and we all went into the house. We went up to the second floor apartment and into the ded room I gave the bag to Bubles and he dumped it. There was $2.00 and twenty-two cent in change in the little purse. I took the pocketbook and looked through it and did not see anything then I took the pocketbook and placed it in the paper bag and took it and threw it behind the garage across the street. I went back to the house and a few minutes later the Police arrived and locked us up. Q. What kind of paper bag was it. A. It was a brown shoping bag it had a name in red on it but I dont remember what the name was. Q. What happened to the $2.22? A. . . . I gave it back to Bub, and I don't know what he did with it. . . . Q. What did you mean when you told Norman you could get some big money. A. Our intentions was to get a car tape and put it in the bag. Q. What did you need the money for. A. For drugs. Q. When did you decide to help Bub get the Pocketbook. A. Whe I saw him coming through the alley I decided to help him by letting him put the pocketbook in the papeerbag. Q. Was Norman and Steve look out for Bub. A. They did not say they were look outs they just folllowed him and did it with out saying anything. Q. Did you ever see the old women before? A. No. Q. Can you describe this women? A. She was a little taller than Bubles she was old and she was a white lady. Q. Did you see Bubles take the pocketbook? A. No. Q. What is Bubles real name and address. A. I don't know he about 17. . . . Q. Can you discribe the pocketbook that Bubles took from the old lady. A. It was brown and squar. Q. Why did you take the brown paperbag with you when you

left 1225 Silver St. with Norman Washington? A. I was going to use the bag for the car tape or something that I could get to put in it. . . . Q. Is there anything else you can add to this statement? A. No. . . ."

On the basis of appellant's statement and the aforementioned evidence, appellant was convicted by a jury of first degree murder and aggravated robbery. After denial of his post-trial motions, appellant was sentenced to life imprisonment for murder and to a term of ten to twenty years for aggravated robbery, to run consecutively to the sentence for murder.

In this appeal, appellant first argues that the evidence in this case is insufficient to link appellant to the robbery which resulted in Miss Seal's death. However, if the evidence was sufficient to establish that appellant was part of a plan to rob Miss Seal, he could be convicted under the well-known principle that if one or more persons engage in the commission of, or in an attempt to commit, a robbery, and during the perpetration of that robbery or attempt, a victim is killed by one of the felons, all of the co-felons who were parties to the conspiracy are equally guilty of murder. See *Commonwealth v. Eiland,* 450 Pa. 566, 301 A. 2d 651 (1973) ; *Commonwealth v. Williams,* 443 Pa. 85, 277 A. 2d 781 (1971).

The law has traditionally defined a "crime" in terms of an overt act committed with the requisite criminal intent. The principle by which a member of a conspiracy may be held criminally responsible for crimes which were actually committed by other members of the conspiracy stems from the belief that, in the case of each co-conspirator, since his knowing entry into the conspiracy is proof of his own criminal intent, it is perfectly fair and proper to hold him responsible for any crimes committed in furtherance of the conspiracy. Thus, in the instant case, if appellant entered into a conspiracy to rob Miss Seal, the law will hold

him responsible for her death which resulted from that robbery.

Appellant argues that there was no conspiracy to take Miss Seal's purse. Rather, according to appellant, the theft of the purse was simply the act of one individual, the appellant's friend, Bubbles, acting on his own. While appellant admits that the four boys had conspired "to get some big money", it is appellant's position that, with the exception of Bubbles, the boys had only agreed to commit property crimes, such as stealing tapes from automobiles, crimes which are significantly different from the crime which occurred here—the robbery of an old woman—with its concommitant risk that death or serious bodily harm to the victim could result.

However, we believe that there was sufficient evidence in this case from which a jury could infer that appellant and his friends had conspired with Bubbles to commit the robbery of Miss Seal. Ulysses Osborne testified that he had seen the four boys together shortly before the robbery, which testimony was contrary to appellant's statement to the effect that he and Norman Washingon just happened to meet Bubbles and Steve Williams on the street. Appellant admitted that he was standing conveniently nearby the scene of the robbery, so that his paper bag could be used to conceal the victim's purse.

Appellant's statement also indicated that the other two boys acted as lookouts, even though there was no oral agreement as to the roles they were to play in the robbery. Then after the robbery, the four boys were again seen running together back to the house, with appellant holding the victim's purse in his paper bag, after which time appellant was later seen disposing of the purse. From all of this evidence, the jury could reasonably conclude that the robbery of Miss Seal was the product of concerted action among the four boys.

Appellant next argues that his statement should not have been admitted into evidence. The Commonwealth's evidence showed that the appellant, eighteen years of age and of a normal mental status, made his statement voluntarily, after being fully advised of his rights and in the presence of his mother. Appellant admits that he was adequately warned, but contends that he told the investigating detective that he could not afford a lawyer and wanted one to be appointed for him. However, since the police witnesses testified that no such request was made, it is apparent that this issue of credibility was resolved in favor of the Commonwealth and there is more than ample evidence to support the court's conclusion that the confession was admissible. See *Commonwealth v. Moore*, 443 Pa. 364, 279 A. 2d 179 (1971).

Appellant also argues that the Commonwealth's evidence was insufficient to establish that Edith Seal died as a result of the assault upon her by appellant's co-conspirator. However, the Commonwealth's expert, Dr. Segal, testified that beyond a reasonable doubt the fractured hip she suffered as the result of the assault, and the complications which she suffered as a result of the injury, all of which complications are not unusual for an elderly person, led to acute pneumonia and eventually to death. He characterized this phenomenon as a "chain reaction" which had been "set off" by the fracture of the hip. In the doctor's words: ". . . the starting point is if she hadn't fractured her hip none of this would have occurred. Now, this doesn't mean to say that she wouldn't have a natural death. She had arteriosclerosis, she would have had cancer, she would have a number of the other things mentioned in the list of diagnoses. But those things did not cause her death. She was walking around with them before she fractured her hip, and most presumably she would have walked around with them had she not fractured her hip."

The doctor explained that his use of the words "most presumably" stemmed from his belief that there was no way of predicting when Miss Seal's other medical problems would have led to her death, were it not for the complications she suffered as a result of the fractured hip. Such conjecture is necessary whenever a person dies suddenly from inflicted injuries. After all, as the doctor explained, Miss Seal might also "have been run over by a car" three days after "the date of her injury". Nevertheless, the doctor again reiterated his conclusion that "the cause of death was the fracture of the hip."

We are satisfied that the evidence was sufficient to support the jury's verdict. See *Commonwealth v. Carn*, 449 Pa. 228, 296 A. 2d 753 (1972); *Commonwealth v. Odom*, 448 Pa. 474, 295 A. 2d 331 (1972); *Commonwealth v. Cheeks*, 423 Pa. 67, 223 A. 2d 291 (1966).

Appellant raises one more allegation of error. He argues that the court took away the possibility of a second degree murder verdict in his instructions to the jury after the jury had returned to the courtroom to request additional instructions on the difference between first and second degree murder.

The court first repeated the statutory definitions of first and second degree murder, explaining, as he had done in his initial charge, that "the only difference between first degree murder and second degree murder is the willful intent to kill. If there is no willful intent to kill and all of the other elements are present except the willful intent to kill then it is murder of the second degree." The court then explained the felony-murder doctrine and concluded his additional instructions with the following statement: "If you believe from the evidence beyond a reasonable doubt that they had an agreement on Lehigh Avenue, they were looking for somebody with money and that they went around until

they saw this lady, even though one of them did not like it and he said she did not have any money and the fellow who did the pushing said I hit her last week and I got some money, even though this man turned off at 12th Street and went to 13th and Silver he took the pocketbook and put it into the brown bag that he was carrying and put it under a car and retrieved it from a man that took it from under the car, if you believe from the evidence beyond a reasonable doubt that this was all part and parcel of what they intended to do, even though the defendant did not touch this lady, then he is guilty of aggravated robbery even though he never touched her *and he is guilty of course of murder in the first degree under the murder felony rule.* However, you have to believe that from the evidence and you have to believe it beyond a reasonable doubt. If you do not believe that beyond a reasonable doubt you cannot convict him of robbery or murder in the first degree." (Emphasis supplied.)

Appellant objected at trial, and argues now, that this instruction, which in effect told the jury that they must either find appellant guilty of first degree murder or acquit him, effectively removed the possibility of a second degree murder verdict from the jury's consideration. It is settled law that all co-conspirators to a murder committed pursuant to the commission of a felony may be found guilty of first degree murder. *Commonwealth v. Yuknavich,* 448 Pa. 502, 295 A. 2d 290 (1972); *Commonwealth v. Sampson,* 445 Pa. 558, 285 A. 2d 480 (1971). Nevertheless, juries have the power to return a verdict of second degree murder in a felony-murder situation and we have frequently stated that a trial court commits reversible error when it fails to charge the jury on second degree murder in all cases where second degree murder is a permissible verdict. *Commonwealth v. Schwartz,* 445 Pa. 515, 521, 285 A. 2d 154 (1971); *Commonwealth v. Collins,* 436 Pa. 114, 259 A. 2d 160 (1969).

However, we have also held that the trial judge need not instruct the jury that they may, as an act of mercy, return a verdict of second degree in a felony-murder situation. *Commonwealth v. Schwartz, supra,* at 520. Instead, all that is required in such cases is that the court define the various types of homicide and tell the jury that they have the ultimate responsibility of fixing the degree of guilt. *Commonwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608 (1950); *Commonwealth v. Foster,* 364 Pa. 288, 72 A. 2d 279 (1950).

When the entire charge is reviewed as a whole, it is clear that in both the initial instructions and in the additional instructions, following the jury's request, the jury was charged on murder in both the first and second degrees and was told that the ultimate choice was up to them. Consequently, no error was committed.

Judgment of sentence affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I dissent. There is no exception to the rule that, in a jury trial, all elements of a crime must be found to exist by the jury. A judge cannot take away from the jury consideration of any of the elements of the crime. Murder is the killing of a human being with malice. If the killing occurs without malice, the crime is not murder, although it may be manslaughter. The jury must, therefore, in all murder cases determine whether the defendant acted with malice. The jury, of course, may be instructed that malice may be inferred, if the jury finds that the defendant engaged in the perpetration of a felony. To tell the jury, however, that they must find one of the elements of murder (malice) as a matter of law is to invade the function of the jury.

The confusion in this area arises from a misreading of the Act of June 24, 1939, P. L. 872, §701, as amended, 18 P.S. 4701. The Act does not define murder but establishes *which murders* are first degree murders.

The Act does not state that all *killings* committed in the perpetration of a felony are first degree murders, but states that all *murders* committed in the perpetration of a felony are first degree murders. The Act presupposes that it has already been determined that *murder* has been committed. That question, however, must be determined by the jury and the Act does not state otherwise.

The jury must, therefore, first determine whether the defendant is guilty of murder and then determine whether the defendant is guilty of first degree murder. The judge in this case charged the jury that they were bound to find murder in the first degree if they found that the defendant was guilty of robbery. This took away from the jury a consideration of whether the element of malice, which is necessary for murder, was present.

The only proper charge would be one that instructs the jury that malice is necessary for murder and that *they may infer malice* from the perpetration of a felony or from any other circumstances. If *the jury finds malice and also finds that the defendant was perpetrating a felony,* they should find first degree murder. It is not sufficient to charge the jury that a *killing* in the perpetration of a felony must be first degree murder. They must find a *murder* first, and then decide the degree of murder.

The charge in this case skips a crucial link. The jury must find (1) an intentional killing with malice and (2) that the killing was in the perpetration of a felony, and then it may conclude first degree murder. In this case, the first necessary link was taken from the jury as a matter of law and the defendant was thus deprived of a complete jury trial.