383 A.2d 858

**COMMONWEALTH of Pennsylvania**

v.

**Norbert Edward PRONKOSKIE, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 13, 1977.

Decided March 23, 1978.

George J. Nagle, Public Defender, Frank E. Garrigan, Asst. Public Defender, for appellant.

James J. Rosini, Dist. Atty., Guy W. Schlesinger, Asst. Dist. Atty., for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

Appellant, Norbert Pronkoskie, was convicted by a jury on November 29, 1974, of murder of the first degree in the shooting death of his wife, Ruby Mae Pronkoskie. Post-trial motions were denied and appellant was sentenced to life imprisonment. This appeal followed.[1]

The record shows that Pronkoskie spent the evening of December 8, 1973, drinking with friends, at the conclusion of which he stopped at the home of his parents-in-law, Ivan and Sophie Boyer, to pick up his automobile. He then drove to his own trailer home, located about a quarter of a mile south of the Boyer residence. Within an hour appellant, accompanied by his three year old daughter, Tina, returned to the Boyer home. He awakened the Boyers by calling "Ivan, Ruby's been shot." The Boyers, Pronkoskie and his daughter returned to the Pronkoskie trailer where the body of Ruby Pronkoskie was found. She had been shot in the upper torso, and the wound caused thereby was, according to the Commonwealth's pathologist, the cause of death, which he placed at about midnight. Several other bullets had been shot in the home. The police were summoned.

1. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, § 202(1), 17 P.S. § 211.202(1) (Supp.1977–78), which places jurisdiction in this Court for the appeal from a murder conviction.

Shortly thereafter, at approximately 1:00 A.M., Pronkoskie took Tina to the home of a neighbor, Mrs. Diane Klinger. While alone with Mrs. Klinger, Tina said to her: "Daddy had a gun. The gun is on the shelf in my bedroom," and "We were going to go to Mammy's [her grandmother, Mrs. Boyer's residence]. Mommy told me to get under the bed but I stayed on top." Later the same night Tina was alone with her eight-year-old cousin, Angela Boyer. During this period Tina stated to Angela: "Daddy didn't love us anymore"; "Daddy had a gun in his hand"; and, "Daddy shot mommy." These declarations were relayed to the police, who in due course charged appellant with the murder of his wife.

The trial judge determined that because of her tender years, Tina Pronkoskie was incompetent to testify. The Commonwealth then placed her statements to Angela Boyer and Diane Klinger into evidence by calling Boyer and Klinger as witnesses. Pronkoskie now asserts, as he did at trial, that the introduction of these statements was a violation of the hearsay rule and requires the grant of a new trial. We agree.[2]

The Commonwealth defends the admission of Tina's out-of-court utterances on the theory that they qualify under the *res gestae* exception to the rule against hearsay. As we have recognized, "*res gestae*" is actually a generic term encompassing four discrete exceptions to the

---

2. In light of this disposition of the case, we do not reach the other grounds advanced in support of the motion for a new trial. These are that reversible error was committed when the trial court: (1) admitted prejudicial testimony regarding the location of the murder weapon; (2) unduly restricted cross-examination of certain Commonwealth witnesses; (3) refused to allow the defense to reopen its case for further testimony; (4) permitted the members of the jury to examine certain allegedly prejudicial photographs previously admitted into evidence; and (5) inaccurately charged the jury concerning intoxication as a defense, the elements of voluntary manslaughter and the definition of "premeditation." The appellant also asserts that there was insufficient evidence upon which a jury could return a verdict of guilty. This last claim we have reviewed in light of the record and find it to be without merit. *See* Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 (1964).

hearsay rule: (1) declarations as to present bodily conditions; (2) declarations of present mental states and emotions; (3) excited utterances; and (4) declarations of present sense impressions.[3] See *Commonwealth v. Cooley*, 465 Pa. 35, 348 A.2d 103 (1975); McCormick, Evidence, § 286 (2nd Ed. 1972). That Tina's statements would not qualify under the first, second and fourth of the above exceptions is apparent.[4] Given the approximate one-hour delay between the shooting of Ruby Pronkoskie and the first statement made by Tina, it would appear that the only aspect of "res gestae" which might apply would be the excited utterance exception.

 To come within the excited utterance exception to the hearsay rule, a statement must be:

" . . . a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole

**3.** The rather general and imprecise use of the term *res gestae* to include all four exceptions can cause problems. Professor Morgan's comment of over one-half century ago deserves repetition:

"The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as 'res gestae.' It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking." Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae*, 31 Yale L.J. 229 (1922).

See also *Commonwealth v. Coleman*, 458 Pa. 112, 326 A.2d 387 (1974).

**4.** Tina's statements did not describe or refer to present physical or emotional states, nor did they convey a "present sense impression," since such a statement must by definition be contemporaneous with the event to which the declaration refers. *See* McCormick, Evidence, § 297 (2nd Ed. 1972).

or in part from his reflective faculties." *Allen v. Mack,* 345 Pa. 407, 410, 28 A.2d 783, 784 (1942).

See also *Commonwealth v. Little,* 469 Pa. 83, 364 A.2d 915 (1976); *Commonwealth v. Cooley, supra.* Thus, it must be shown first, that Tina Pronkoskie had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event. See *Commonwealth v. Little, supra; Commonwealth v. Cooley, supra.* Tina's statements must be examined in light of these criteria.[5]

**5.** Appellant argues that even if Tina's statements would normally be admissible under some evidentiary rule, the finding that Tina herself is incompetent to testify renders all of her declarations inherently unreliable. In light of our finding that her declarations do not qualify as excited utterances (see *infra*) and are therefore inadmissible, we need not decide this question. We deem it appropriate to observe, however, that a finding of incompetency to testify does not necessarily undermine the indicia of reliability attendant upon an excited utterance of the incompetent witness. The relevant inquiries in a voir dire proceeding to determine a particular witness' competency to testify involve: (1) the capacity to perceive an event with accuracy; (2) the ability to remember; (3) the ability to understand questions and communicate a response; and (4) a consciousness of the duty to tell the truth. See *Commonwealth v. Baker,* 466 Pa. 479, 353 A.2d 454 (1976). The inherent reliability of an excited utterance, on the other hand, arises from the spontaneity of the response and will normally remain undiluted by faulty memory, inability to understand questions or otherwise to communicate on the witness stand. See, *e. g. Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973); *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291 (1966); VI Wigmore, Evidence, §§ 1747, 1749 (3d ed. 1940); McCormick, Evidence §§ 288–290, 297 (2nd ed. 1972). Accordingly, there is respectable authority for the proposition that an otherwise properly qualifying excited utterance is not rendered inadmissible by a ruling that the declarant is incompetent to testify. See *Chicots v. Borough of Sewickley,* 112 P.L.J. 454 (1964); *Commonwealth v. Bardino,* 20 Pa.Dist. 473, 3 Berks Co.L.J. 350 (1911); *Ortega v. State,* 500 S.W.2d 816 (Tex.Cr.App.1973); *Johnston v. Ohls,* 76 Wash.2d 398, 457 P.2d 194 (1969); *State v. Simmons,* 52 N.J. 538, 247 A.2d 313 (1968); *State v. Butler,* 249 Cal.App.2d 799, 57 Cal.Rptr. 798 (1967); *State v. Boodry,* 96 Ariz. 259, 394 P.2d 196 (1964); *Price v. State,* 41 Ala.App. 239, 128 So.2d 109 (1961); *State v. Hutchison,* 222 Or. 533, 353 P.2d 1047 (1960); VI Wigmore, Evidence, § 1751 (3d ed. 1940); McCormick, Evidence, § 297 (2d ed. 1972); Annotation: Declarant's Age as Affecting Admissibility of Res Gestae, 83 A.L.R.2d 869 and cases cited therein. But see *State v. Rothi,* 152 Minn. 73, 188 N.W. 50 (1922); *Adams v. State,* 34 Fla. 185, 15 So. 905 (1894).

■ As to the first requirement, there can be no doubt that the occurrence here involved—the shooting of one's mother by one's father—would normally be a grievously shocking, indeed a catastrophic, event to a child of tender years. For a declaration about the event to be admissible, however, it must also appear that the declarant perceived the happening which he or she is talking about. See *Carney v. Pennsylvania R.R. Co.*, 428 Pa. 489, 240 A.2d 71 (1968) (plurality opinion); *Allen v. Mack*, 345 Pa. 407, 28 A.2d 783 (1942).[6] While the Commonwealth has established Tina's presence in the trailer at the time of the shooting, there is nothing to indicate that Tina actually saw what occurred.[7] Indeed, her responses during the competency examination contain repeated indications that she did not actually see the shooting.[8] While generally the proponent of the evidence

6. This is not to say that a proponent must in all cases conclusively establish that a declarant actually viewed the event to which the declaration relates. Compare *Carney v. Pennsylvania R.R. Co.*, *supra; Williamson v. Philadelphia Transportation Company*, 244 Pa.Super. 492, 368 A.2d 1292 (1976). As Professor McCormick has noted:

"Must the declarant meet the tests of competency for a witness? In a modified manner the requirement that a witness have had an opportunity to observe that to which he testifies is applied. Direct proof is not necessary; if the circumstances appear consistent with opportunity by the declarant, this is sufficient. If there is doubt the question is for the jury. Especially in cases where the declaration is of low probative value, however, it is usually held inadmissible if there is no reasonable suggestion that the declarant had an opportunity to observe." McCormick, Evidence § 297 at pp. 707–08 (2d ed. 1972) (footnotes omitted.)

Where young children are involved, however, there is a greater risk that outside influences or imagination may have tempered the perception of an event and thus a court must exercise greater caution in allowing such an issue to reach the jury.

7. The record discloses that Tina had her own bedroom, separate from the bedroom of her parents. It is possible, therefore, that the child did not, in fact, witness the shooting and that her statements indicated a child's perception of an incident which caused her to be awakened in the middle of the night.

8. During questioning of Tina by the trial judge, the following questions were asked and answers given:

"Q. [BY THE COURT] The police found it? What did your Daddy do with the gun when he had it in his hand?
A. [BY TINA] He wanted to kill my Mommy.
Q. He wanted to kill your Mommy? Who told you that? Who told you that? Anybody?

need only establish that a declarant was in a position to view an incident, *see* n.6, *supra*, the present record raises serious enough doubts concerning Tina's presence at the event that

A. (Nods negatively)

Q. Nobody told you to say that? Did you see him with the gun?

A. (Nods affirmatively)

Q. Did you see him with the gun in your trailer where you lived?

A. (Nods affirmatively)

Q. Was the gun shot? Did he shoot the gun? Tina, did he shoot the gun?

A. (Nods negatively)

MR. NAGLE: She's shaking her head no, Your Honor.

Q. You didn't see him shoot the gun? He didn't shoot the gun?

A. (Nods negatively)

Q. Tina, was that a long time ago?

A. (Nods affirmatively)"

(Transcript at pp. 829–830).

\* \* \* \* \* \*

"Q. Where was your Mama? Was she standing up or in bed or where?

A. She was sitting down.

Q. Where was she sitting? On a chair?

A. On my bed.

Q. She was sitting on your bed. Then your Daddy had the gun, is that so? What did your Daddy do with the gun?

A. He hide it in the woods.

Q. He hide it in the woods. Well, before he hide it in the woods, did your Daddy shoot the gun?

A. (Nods negatively)

Q. You didn't see him shoot the gun?

A. (Nods negatively)"

(Transcript at p. 831).

\* \* \* \* \* \*

"Q. You know it happened. Did you see it happen?

A. No.

Q. You didn't see it happen, but you know it happened?

A. (Nods affirmatively)

Q. When who was killed?

A. My Mommy.

Q. Were you there? Did you see her get killed?

A. (Nods affirmatively)

Q. How did she get killed?

A. He shot all the trinkets off.

Q. He shot what off?

A. The trinkets off.

Q. Trinkets off? You mean off the shelf in the house? Did he shoot other things besides your Mama?

A. He shot my Mommy, too.

Q. He shot your Mommy? Did you see him shoot the gun?

A. No.

a verdict based upon her statements would border upon speculation or conjecture. Such a verdict, of course, is impermissible. See, *e.g., Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545 (1976); *Commonwealth v. Stanley,* 453 Pa. 467, 309 A.2d 408 (1973); *Commonwealth v. Bailey,* 448 Pa. 224, 292 A.2d 345 (1972); *Commonwealth v. McFadden,* 448 Pa. 146, 292 A.2d 358 (1972); *Commonwealth v. Bennett,* 224 Pa.Super. 238, 303 A.2d 220 (1973).

■ The second requirement of the excited utterance exception is that the declaration be a spontaneous reaction to the startling event. As we stated in *Commonwealth v. Cooley, supra:*

"The spontaneity of such statements is, of course, dependent on the peculiar facts and circumstances of each case. We have held that time lapses equal to and greater than that present here do not bar the admission of a statement where the spontaneity born of excitement is otherwise satisfactorily shown to exist. *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1974) (15–20 minutes); *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291 (1966) (45 minutes). We have also held repeatedly that the mere fact that a statement is made in response to a question does not prevent its admission as a res gestae statement. *Commonwealth v. Banks,* supra; *Commonwealth v. Edwards,* 431 Pa. 44, 244 A.2d 683 (1968); *Commonwealth v. Stokes,* 409 Pa. 268, 186 A.2d 5 (1962); *Commonwealth v. Rumage,* 359 Pa. 483, 59 A.2d 65 (1948); *Commonwealth v. Harris,* 351 Pa. 325, 41 A.2d 688 (1945). It is true, of course, that in some instances the time lapse may be so long or the question and answer exchange so unhurried and reflective as to require a finding of nonspontaneity, but such was not the case here." 465 Pa. at 41–42, 348 A.2d at 107.

Q. How did you know he shot your Mama?
A. Cause.
Q. Because why, Tina?
A. I know it happened."
(Transcript at pp. 836–37).

Thus, there is no clear-cut rule as to the time sequence; whether the actual delay between the event and the statement is sufficient to negate "spontaneity" must be resolved in light of the particular facts of each case.[9] *Commonwealth v. Banks, supra; Commonwealth v. Cheeks, supra; Commonwealth v. Stokes*, 409 Pa. 268, 126 A.2d 5 (1962). In the instant case, we cannot find that the time lapse of approximately one hour between the shooting and the first declaration occurred under circumstances which nevertheless strongly indicated the spontaneity of the statements. The more incriminatory utterances by Tina were those made in the presence of Angela Boyer. These were even more remote in time. Thus it seems to us not unlikely that Tina's imagination might have distorted her perception of the incident. Furthermore, the "excited" nature of the utterance seems belied by the calm and unemotional manner in which they were made.[10] Such factors weigh against a

9. For example it has been held that the requirement that the statement be sufficiently contemporaneous with the event might be relaxed where the child-declarant is the victim of a sexual assault. *See generally* Annotation, 83 A.L.R.2d 1361. Such a relaxation of the rule recognizes both the likelihood of a young child's inability to comprehend the purpose of the assault and the possibility of the child's hesitancy to discuss the matter for fear of incurring punishment.

10. The following exchange occurred during the cross-examination of Diana Klinger:

"Q. Now, when Tina came to you, what was her physical or emotional condition at that time?
A. She was very calm, she had no teardrops in her eyes.
Q. She had no teardrops?
A. No teardrops in her eyes. You could see she hadn't been crying. She didn't have a messy nose.
Q. Am I correct in saying she exhibited no outward manifestations of shock?
A. She was very calm.
Q. Very calm?
A. Very calm.
Q. Was there anything wrong with her coloring?
A. I don't think so."
(Transcript at 793–94).
And during cross-examination, Angela Boyer stated:
"Q. So you pretty well knew when you were going to come up here these three statements that you made, right?
A. Yes.

conclusion that Tina was still laboring under the shock of the events to such a degree as to negate the possibility of reflective thought on her part before making the statement. See *Lininger v. Kromer*, 238 Pa.Super. 259, 265–71, 358 A.2d 89, 93–95 (1976).

In sum, because of the time and manner in which Tina Pronkoskie's statements were made to the Commonwealth witnesses called to repeat them in court, we conclude that the declarations did not possess the indicia of reliability which are the hallmark of generally recognized exceptions to the hearsay rule. Accordingly, the statements should not have been admitted into evidence.

The judgment of sentence is vacated and appellant is granted a new trial.

JONES, former C. J., did not participate in the consideration or decision of this case.

Q. Could you repeat them again for me.
A. 'Daddy had a gun in his hands. Daddy didn't love us anymore. Daddy shot Mom.'
Q. Was Tina upset when she was telling you these things?
A. Not too much.
Q. Did you ask her questions or was she talking to you?
A. She was talking to me.
Q. She wasn't crying or anything, was she?
A. No."
(Transcript at 874–75).